UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JERRY L. CONWAY, D.C., et al., } | |
| } | |
|     Plaintiffs, } | |
| } | |
| v. } | Case No.: 2:12-cv-02532-RDP |
| } | |
| BLUE CROSS BLUE SHIELD OF } | |
| ALABAMA, et al., } | |
| } | |
|     Defendants. } | |

**MEMORANDUM OPINION**

This case is before the court on the Verified Motion to Intervene for the Limited Purpose of Seeking a Preliminary Injunction filed by Certain University of Pittsburgh Medical Center Hospitals[1] ("UPMC"). (Doc. # 584). In the Motion, UPMC seeks to intervene in this case to pursue a preliminary injunction prohibiting the enforcement of (or compliance with) the exclusive service areas provided for in the License Agreements between BCBSA and the Blue Plans. (*Id.*). The Motion has been fully briefed. (Docs. # 588-595). For the reasons explained below, the Motion is due to be denied.

**I.    Background**

UPMC is "the dominant provider of health care services in western Pennsylvania." *Commw. ex rel. Kane v. UPMC*, 129 A.3d 441, 445 (Pa. 2015). "In 2002, UPMC entered into a ten-year 'provider agreement' with Highmark under which it furnished health care services on an

---

[1] Certain "UPMC Hospitals" include UPMC East, UPMC Hamot, UPMC Magee-Womens Hospital, UPMC McKeesport, UPMC Mercy, UPMC Passavant, UPMC Presbyterian Shadyside, and UPMC St. Margaret.

in-patient or out-patient basis to subscribers of Highmark's commercial insurance plans and billed Highmark for those services at specified, negotiated rates." *Kane*, 129 A.3d at 445.

"[I]n the Spring of 2011, UPMC announced it would not agree to renew or renegotiate these provider agreements with Highmark, the majority of which were set to expire on June 30, 2012." *Id*. "UPMC cited as its reason Highmark's proposed affiliation with the West Penn Allegheny Health System, which would create another integrated health care delivery system in competition with the UPMC system." *Id*. "The Commonwealth [of Pennsylvania] considered the expiration of these agreements as having deleterious consequences for members of Highmark's health insurance plans because, according to the Commonwealth, these members would be subjected to 'significantly higher out-of-network charges for their health care needs unless they either switched their health care provider away from UPMC or their health plan away from Highmark to one of the health insurers with which UPMC had contracted, albeit at higher prices.'" *Id*. at 445-46.

In May 2012, following a mediation organized by the Commonwealth, UPMC and Highmark entered into an agreement that extended certain of the entities' provider agreements until December 31, 2014. *Id*. at 446. Also in May 2012, UPMC filed a lawsuit against Highmark and West Penn in federal court in Pennsylvania challenging, in part, the Blues' exclusive service areas and Licensing Agreements. (W. D. Pa. Case No. 2:12-cv-00692-JFC, *UPMC v. Highmark, et al*., Doc. # 1).

On August 8, 2012, Blue Cross and Blue Shield Association ("BCBSA") moved to intervene in the Western District of Pennsylvania case, ostensibly to defend its licenses of the Blue Cross and Blue Shield service names and marks. (W. D. Pa. Case No. 2:12-cv-00692-JFC, Doc. # 43). After BCBSA designated the case for tag along treatment in this MDL, UPMC

amended its Complaint to remove allegations regarding the illegality of the exclusive service areas. (W. D. Pa. Case No. 2:12-cv-00692-JFC, Doc. # 64). Thereafter, BCBSA withdrew its Motion to Intervene. (W. D. Pa. Case No. 2:12-cv-00692-JFC, Doc. # 74).

In May 2014, on at least two occasions, UPMC sent letters to various non-Highmark Blue Plans, seeking to contract directly with them. (Doc. # 585, Ex. E).[2] BCBSA responded to UPMC's letters stating that BCBSA grants Blue Plans the right to use the Blue trademarks only in their respective service areas and thus the non-Highmark Blue Plans could not accept UPMC's offer to contract. (Doc. # 585-6).

In June 2014, after unsuccessful attempts by the Pennsylvania Office of Attorney General ("OAG") to mediate a new agreement between Highmark and UPMC, the OAG filed a petition for review in the Commonwealth Court. *Kane*, 129 A.3d at 447–48. Shortly thereafter, on June 27, 2014, UPMC and Highmark entered into separate, nearly identical, reciprocal Consent Decrees with the OAG. *Id*. at 448. The 2014 Consent Decrees ran for a term of five years and are set to expire on June 30, 2019. *Id*. at 450.

In April 2018, after this court's April 5, 2018 Standard of Review opinion was issued, UPMC renewed its offer to contract directly with the other Blues and was again rebuffed because of the License Agreements. (Docs. # 585-10, 585-11).

After unsuccessful attempts by the OAG to negotiate modifications to extend the Consent Decrees, which Highmark (but not UPMC) was willing to accept, on February 7, 2019, the OAG filed a Petition to Modify the Consent Decree governing the relationship between UPMC and Highmark. (Doc. # 585 ¶ 31). That petition is pending in the Commonwealth Court of Pennsylvania, Case No. 334 M.D. 2014. (*Id.*).

---

[2] Although the court received a courtesy copy of Exhibit E, that exhibit apparently did not make it onto the court's docket.

On February 21, 2019, the same day it filed its Motion to Intervene in this case, certain UPMC entities filed a class action Complaint in the United States District Court for the Middle District of Pennsylvania against Joshua D. Shapiro, the Attorney General of the Commonwealth of Pennsylvania. (M.D. Pa. Case No. 1:19-cv-00298-JEJ, *UPMC Pinnacle, et al. v. Shapiro*, Doc. # 1). That case challenges efforts by Shapiro to impose new obligations on Pennsylvania nonprofit entities, including the following relevant requirements:

> (a) Nonprofit health plans must contract with any healthcare provider that seeks an MA or commercial contract;
>
> (b) similarly, nonprofit healthcare providers must contract with any insurer that wants a commercial or MA contract;
>
> (c) if the parties to these forced contracts cannot agree on the rates to be paid or the other terms, they must submit to arbitration before a panel empowered to set the terms of the contract for them;
>
> (d) in the event that a nonprofit healthcare provider lacks a contract with a particular insurer, any emergency services provided to that insurer's subscribers must be reimbursed at rates established by the Office of Attorney General;

(M.D. Pa. Case No. 1:19-cv-00298-JEJ, Doc. # 1 ¶ 29).

UPMC is a putative Provider class member in MDL 2406 and, as such, is represented by Co-Lead Class Counsel, Edith M. Kallas and Joe R. Whatley, Jr., who also represent UPMC in this matter. (Doc. # 584).

## II. Standard of Review

UPMC argues that it satisfies the requirements of both intervention of right under Federal Rule of Civil Procedure 24(a), and permissive intervention under Rule 24(b). (Doc. # 584 at 6). The court addresses Rule 24's separate divisions, in turn.

### A. Intervention of Right

Rule 24(a) provides:

> (a) Intervention of Right. On timely motion, the court must permit anyone to intervene who:
>
>> (1) is given an unconditional right to intervene by a federal statute; or
>>
>> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a).

UPMC has not alleged that a federal statute confers an unconditional right to intervene here, and the court is unaware of any such provision. Thus, to intervene by right, UPMC must satisfy Rule 24(a)(2). To qualify for intervention as a matter of right pursuant to Rule 24(a)(2) an applicant must show that: (1) his application is timely; (2) he has an interest relating to the property or transaction which is the subject of the action; (3) he is so situated that disposition of the action, as a practical matter, may impede or impair his ability to protect his interest; and (4) his interest is represented inadequately by the existing parties to the suit. *Worlds v. Department of Health and Rehabilitative Services*, 929 F.2d 591, 593 (11th Cir. 1991) (citing *Chiles v. Thornburgh*, 865 F.2d 1197 (11th Cir. 1989)).

### B. Permissive Intervention

Alternatively, UPMC seeks permissive intervention. Rule 24(b) permits a party to intervene if, by timely motion, the party asserts "a claim or defense that shares with the main action a common question of law or fact." Fed.R.Civ.P. 24(b). "If there is no right to intervene as of right under Rule 24(a), it is wholly discretionary with the court whether to allow intervention under Rule 24(b) and even though there is a common question of law or fact, or the requirements of Rule 24(b) are otherwise satisfied, the court may refuse to allow intervention." *Worlds*, 929 F.2d at 595. The principal consideration is whether intervention will "unduly prejudice or delay

the adjudication of the rights of the original parties." *Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1250 (11th Cir. 2002); *see also Chiles*, 865 F.2d at 1213.

**III.     Analysis**

Both parts of the rule -- Rule 24(a) and (b) -- require a motion to intervene to be timely filed. *Comm'r, Alabama Dep't of Corr. v. Advance Local Media, LLC*, 2019 WL 1233210, at *7 (11th Cir. Mar. 18, 2019). The burden of proving timeliness is on the proposed intervenor. *Chiles*, 865 F.2d at 1213.

> Whether a motion to intervene is timely depends on four factors:
>
> (1) the length of time during which the would-be intervenor knew or reasonably should have known of his interest in the case before he petitioned for leave to intervene; (2) the extent of prejudice to the existing parties as a result of the would-be intervenor's failure to apply as soon as he knew or reasonably should have known of his interest; (3) the extent of prejudice to the would-be intervenor if his petition is denied; and (4) the existence of unusual circumstances militating either for or against a determination that the application is timely.

*United States v. Jefferson Cty.*, 720 F.2d 1511, 1516 (11th Cir. 1983). "The question whether an application for intervention is timely is largely committed to the district court's discretion[.]" *Reeves v. Wilkes*, 754 F.2d 965, 968 (11th Cir.1985).

In May 2012, almost seven years ago, UPMC initiated its own lawsuit challenging the Blues' "illegal agreement to divide geographic markets" under Sections 1 and 2 of the Sherman Act. (W.D. Pa. Case No. 2:12-cv-00692-JFC, Doc. # 1 at 1-2). However, when faced with a motion from BCBSA to intervene in that case and the potential for transfer to MDL 2406, UPMC amended its Complaint to omit the Sherman Act claims regarding geographic markets. (W.D. Pa. Case No. 2:12-cv-00692-JFC, Docs. # 43, 64). UPMC dismissed those claims at least in part to avoid having that case tagged as a case related to MDL 2406. Thus, in 2012, UPMC

intentionally (and successfully) avoided transfer to this court by omitting from its amended pleading the very claim it seeks to assert now.

Two years later, in 2014, UPMC attempted to contract with the non-Highmark Blues, but was rebuffed because the Licensing Agreements prohibited those Blues from contracting with UPMC. (Doc. # 585-6). Thus for at least five years, UPMC has been exactly where it finds itself now – unable to contract with Blues other than Highmark after previously (albeit briefly) asserting that it has been unlawfully restricted from contracting with non-Highmark Blues.

UPMC argues that its Motion is timely because only recently did the alleged threat of irreparable loss become immediate. (Doc. # 594 at 6-7). However, UPMC appears to have manufactured that immediacy. Yes, the Consent Decrees are set to expire on June 30, 2019. (Doc. # 585 at 15). But UPMC has known of that expiration date for five years, since 2014. *Kane*, 129 A.3d at 448. UPMC has also known since 2014 that the non-Highmark Blues would not contract with it because of the Licensing Agreements' exclusive service areas. (Doc. # 585 at 17). Despite having had knowledge of this MDL and its related interest, UPMC waited through the parties' efforts to mediate the case. (Doc. # 594 at 6-7). UPMC argues that it waited because it hoped that the rules would be changed by agreement. (*Id.*) And, when this court issued its standard of review ruling just over one year ago, UPMC says it continued to wait in hopes that the non-Highmark Blues would voluntarily change their position. (*Id.*) UPMC continued to wait while the Blues sought interlocutory review of the standard of review ruling. (*Id.*) It was only after the Blues' request for an interlocutory appeal was denied, and after the Pennsylvania Attorney General filed an action to modify the Consent Decrees in the Pennsylvania

Commonwealth Court, that UPMC believed there was an imminent danger of irreparable loss. (*Id.*).[3]

So, despite taking affirmative steps to avoid becoming part of the MDL seven years ago, Defendants contend that UPMC now seeks to "join the party" and avail itself of this court's standard of review ruling to seek preliminary injunctive relief. There is a substantial question of whether UPMC's motion to intervene is timely. Considering all of the circumstances, as the court must, it appears that UPMC has missed the boat.

As noted above, in our Circuit, courts consider four factors to determine whether a motion to intervene is timely: (1) the length of time the would-be intervenor knew or reasonably should have known of his interest in the case before he moved to intervene; (2) the extent of prejudice to the existing parties as a result of the would-be intervenor's failure to apply as soon as he knew or should have known of his interest; (3) the prejudice to the would-be intervenor should intervention be denied; and (4) any unusual circumstances militating for or against intervention. *Jefferson Cty.*, 720 F.2d at 1516. In applying these factors, district courts have been instructed to bear in mind that "[t]he requirement of timeliness must have accommodating flexibility toward both the court and the litigants if it is to be successfully employed to regulate intervention in the interest of justice." *Georgia*, 302 F.3d at 1259–60 (allowing intervention where "the court had yet to take significant action.").

Beginning with the first factor, the "length of time that the proposed intervenor knew or reasonably should have known of its interest in the case," *Jefferson Cty.*, 720 F.2d at 1516, the

---

[3] Defendants suggest that the alleged irreparable harm is, at least to some extent, self-inflicted. UPMC has been operating under the Consent Decrees for five years. For the past two years, the OAG has attempted to negotiate modifications to the Consent Decrees to continue the relationship between UPMC and Highmark. (Doc. # 589 at 9; Doc. 589-1). Highmark reportedly has agreed to the OAG's modifications, but UPMC has not. (Doc. # 589 at 9; Doc. # 589-1).

court simply cannot ignore the fact that UPMC has known of its interest in this case for at least *five years*. During that time period, *significant* litigation has occurred and common discovery in this MDL is now complete. *See, e.g., Consumer Fin. Prot. Bureau v. Ocwen Fin. Corp.*, 2018 WL 4922457, at *3 (S.D. Fla. Sept. 27, 2018) (denying permissive intervention where "[p]ermitting intervention would force the parties in this case to litigate factual questions not presently at issue, and the scope of discovery, which has already been underway for over a year, would necessarily expand to include the claims of the proposed Intervenors."); *Eddy Leal, P.A. v. Bimini Dev. of Vill. W. Corp.*, 2018 WL 4776377, at *4 (S.D. Fla. Aug. 28, 2018) (denying intervention where the case was nearly 18 months old and proposed intervenor "should have known of this case long ago when it commenced."); *S.E.C. v. Creative Capital Consortium, LLC*, 2015 WL 4077451, at *2 (S.D. Fla. July 6, 2015) (intervention untimely where proposed intervenor waited two years and four months to seek intervention); *Reeves v. Wilkes*, 754 F.2d 965, 970 (11th Cir. 1985) (intervention untimely after two years and eight months); *Hollywood Cmty. Synagogue, Inc. v. City of Hollywood, Fla.*, 254 Fed. App'x 769, 771 (11th Cir. 2007) (intervention untimely after twenty-two months); *Georgia,* 302 F.3d at 1259 (intervention untimely after six months).

Here, as early as 2012, UPMC had actual knowledge of its interest in this MDL. Yet, at that time, it made the deliberate choice to avoid participating. Therefore, to conclude that UPMC's Motion is timely would require the court to read the timeliness factor right out of Rule 24. *See NAACP v. New York*, 413 U.S. 345, 365 (1973) ("If it is untimely, intervention must be denied. Thus, the court where the action is pending must first be satisfied as to timeliness.").

The second and third factors, "prejudice," are "the [context-specific] essence of the timeliness inquiry." *Meek v. Metro. Dade Cnty., Fla.*, 985 F.2d 1471, 1479 (11th Cir. 1993)

*abrogated on other grounds by Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324 (11th Cir. 2007). The inquiry is whether prejudice to one side would "outweigh" the prejudice to the other. *See Brown ex rel. O'Neil v. Bush*, 194 F. App'x 879, 883 (11th Cir. 2006).

UPMC argues that there would be little prejudice to the existing parties to this MDL because (1) its request for preliminary injunctive relief will be based on the court's standard of review ruling, (2) intervention will not delay the case or change the upcoming schedule for class certification and summary judgment motions, and (3) if this court does not grant its Motion, it will be forced to refile in federal court in Pennsylvania and work through the process of having the JPML transfer the case back to this court. (Doc. # 584 at 10; Doc. # 594 at 7). UPMC's arguments miss the mark for at least three reasons.

(1) This court has not concluded that the ESAs, on their own, are a *per se* violation of the Sherman Act. What the court held was:

> Defendants' *aggregation* of geographic market allocations and output restrictions are due to be analyzed under a per se standard of review. Their BlueCard program and other alleged Section 1 violations are due to be analyzed under the Rule of Reason.

(Doc. # 2064).

(2) If permitted, UPMC's intervention would require additional discovery from UPMC and Highmark with regard to the Consent Decrees. The parties would also have to conduct discovery into any alleged irreparable harm and the implications of competition between UPMC and Highmark now that they are both integrated health networks offering insurance and health care options. (Doc. # 594 at 5). Yet, common discovery is largely closed in the MDL. The parties are on a tight schedule to conduct class certification expert discovery, class certification motion practice, merits expert discovery, and dispositive motions practice. Thus, even if no changes were made to the schedule in this case, intervention in this case would be disruptive.

(3) It is also unclear that UPMC will be prejudiced if its Motion is denied. There is currently litigation pending between UPMC and the OAG in both federal and state courts in Pennsylvania. Although the claims asserted in those actions are not Sherman Act claims, they relate to the particular dispute between UPMC and Highmark and the impending expiration of the Consent Decrees. That is, the alleged irreparable harm may (or may not) come to pass based on those proceedings in Pennsylvania. UPMC can seek injunctive relief in either of those currently pending disputes.

The fourth factor in the intervention calculus is the existence of unusual circumstances militating either for or against a determination that the application is timely. *Salvors, Inc. v. Unidentified Wrecked & Abandoned Vessel*, 861 F.3d 1278, 1294 (11th Cir. 2017). Here, there are comity questions at play. Comity requires federal courts to exhibit "a proper respect for state functions." *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 112 (1981) (quoting *Younger v. Harris*, 401 U.S. 37, 44 (1971)). The principal of comity was given its "fullest articulation" in *Younger v. Harris*, a case involving federal-court interference with a state criminal prosecution. *Id.* at 111. As *Younger* explained, comity entails "a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in separate ways." 401 U.S. at 44. Though *Younger* involved federal-court interference with state criminal proceedings, the principles of comity it relied upon are not limited to that context. To the contrary, "[t]he principles of federalism recognized in *Younger* . . . have been extended to some state civil actions." *Fair Assessment*, 454 U.S. at 112. Though UPMC does not here seek to directly enjoin state judicial proceedings, the relief it seeks could well have the effect of disrupting ongoing state proceedings aimed at

11

resolving the same problem presented in this lawsuit. As explained below, the court finds that this possibility for interference with ongoing state proceedings further supports its conclusion that UPMC's motion to intervene is due to be denied.

UPMC is a Pennsylvania non-profit charitable organization. In 2014, the Pennsylvania OAG filed a petition against UPMC in Pennsylvania Commonwealth Court and ultimately secured the Consent Decrees which are set to expire in June. The OAG had an interest in the matter because of the potential effects on the healthcare of millions of Pennsylvania citizens, and the Pennsylvania Department of Insurance and Department of Health is also a signatory to the Consent Decrees. The Consent Decree provides "that the Commonwealth Court is to retain jurisdiction, for the duration of its existence, 'to enable any party to apply to [the Commonwealth Court] for such further orders and directions as may be necessary and appropriate for the interpretation, modification, and enforcement of this Consent Decree.'" *Kane*, 129 A.3d at 450 (quoting Consent Decree, § IV(C)(11)). "President Judge Pellegrini of the Commonwealth Court entered both decrees as orders of court on July 2, 2014, and they remain in effect until July 2, 2019." *Id.* The OAG's petition to modify the Consent Decrees is currently pending before the Commonwealth Court. (Doc. # 589 at 8-9). Therefore, the court finds that there are in fact unusual circumstances here that militate against intervention. Allowing UPMC's belated intervention -- and in essence inserting an Alabama federal court into what is clearly a significant Pennsylvania conundrum -- would interfere with those state judicial proceedings, potentially prejudice Pennsylvania's efforts to provide healthcare to its citizens, and improperly inject a federal court in another state into important matters implicating Pennsylvania's interests.

### III. Conclusion

Considering all of the relevant factors, the court finds that UPMC's Motion is untimely. Therefore, the Motion to Intervene is due to be denied. A separate order consistent with this memorandum opinion will be entered

**DONE** and **ORDERED** this April 16, 2019.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE